Richard **HIERNAUX**, an individual, d/b/a Marine Sales and Service, Owner of the M/V **CHARLEROI**, Libelant,

v.

The M/V **QUEEN CITY**, her engines, tackle, apparel and furniture and the Ohio River Company, a corporation, Respondents.

No. 64–32.

United States District Court
W. D. Pennsylvania.

June 22, 1965.

Wilder Lucas, of Lucas & Murphy, St. Louis, Mo., and Sanford M. Chilcote, of Dickie, McCamey, Chilcote & Robinson, Pittsburgh, Pa., for libelant.

Raymond Hasley, of Rose, Schmidt & Dixon, Pittsburgh, Pa., for respondents.

MARSH, District Judge.

This is an admiralty action involving a determination of whether or not there was fault on the part of the respondent, The Ohio River Company, which caused the sinking of M/V Charleroi, owned by the plaintiff, Richard Hiernaux. The sinking occurred in the Ohio River near Wheeling, West Virginia, at approximately midnight on the evening of September 22, 1963.

At all relevant times, the Charleroi was a diesel-powered towboat with twin screws and two diesel engines. It was approximately 56 feet long and 15 feet wide, with a hull approximately 5 feet in depth, and a freeboard of about 1½ feet.

Just prior to the accident in question, the Charleroi was descending the Ohio River with four barges in tow. In front of the Charleroi were two loaded barges, one in front of the other; to the starboard and alongside the two loaded barges were two empty jumbo barges attached by wires to the loaded barges. The two loaded barges were each 26 feet wide, 175 feet long, and 11 feet deep; the empty jumbo barges were each 35 feet wide and 195 feet long. The bows of the leading barges were abreast.

The respondent corporation was the owner of the M/V Queen City. This towboat was diesel-powered, 165 feet long and 45½ feet wide overall. Just prior to the sinking of the Charleroi, the Queen City was ascending the Ohio River in the vicinity of Wheeling Island. In front of the Queen City were 14 barges: four barges were abreast for three rows, with an additional barge at the head and another at the center of the tow. Each barge was 175 feet long, 26 feet wide, and 11 feet deep. She was equipped with six flanking rudders installed forward of three screws and in pairs of two each set on each side of the shafts. She also was equipped with three steering rudders set to the aft of each screw and directly in line with the shaft of each screw. Each screw was 91 inches in diameter.

While the Queen City and her tow were approaching the Fort Henry Bridge connecting Wheeling Island with the West Virginia mainland, its captain engaged in a radio-telephone conversation with the pilot of the Charleroi, which was then approximately two miles up river from the Queen City. Both knew that their tows were approaching a channel 325 to 400 feet wide and 9 to 11 feet deep. During the conversation, the captain and the pilot agreed to a one-whistle or a port-to-port passing in the channel above the Fort Henry Bridge, and agreed that the Queen City would pull over to permit the Charleroi to pass.

Subsequent to this radio-telephone conversation, the Queen City passed under the Fort Henry Bridge, pulled to its right and stopped near the left descending bank of the Ohio River above the bridge; its tow was grounded. The Charleroi proceeded down river so as to pass the Queen City port-to-port. Within the distance prescribed by the applicable navigational rules, the two vessels exchanged whistle signals indicating a port-to-port passing in the channel between the West Virginia mainland and Wheeling Island.

Considering the size of the tows, the vessels, and all the attendant conditions, we find that the channel in which the tows met is a "narrow channel". Section 95.11 of Title 33, Code of Federal Regulations, promulgated under 33 U.S. C. § 353, and applicable to the Ohio River, provides as follows:

"When two steam vessels [1] are about to enter a narrow channel at the same time, the ascending steam vessel shall be stopped below such channel until the descending steam vessel shall have passed through it; but should two steam vessels unavoidably meet in such narrow channel, then it shall be the duty of the pilot of the ascending steam vessel to make the proper signals, and when answered the ascending steam vessel shall lie as close as possible to the side of the channel and either stop the engines or move them so as to give the boat only steerageway; and the pilot of the descending steam vessel shall cause his steam vessel to be worked slowly until he has passed the ascending steam vessel."

When the Charleroi came into view about 300 feet ahead, the Captain of the Queen City, irritated because he had run aground to permit a "small" tow to pass,

---

1. 33 C.F.R. § 95.03(a).

expressed an intention to injure the Charleroi and its tow. Acting thereon, he suddenly started his motors, set them at three-quarters to full speed ahead, reversed the propellers, and turned the flanking rudders hard to port. At that time the watchman remarked that the approaching Charleroi had a low freeboard and was sitting low in the water. The captain acknowledged these statements but did not stop his dangerous maneuver.

As the Charleroi continued to approach, steering slightly to port in order to line up with the center of the Fort Henry Bridge span ahead, the propellers of the Queen City caused the water to surge turbulently out into the shallow channel into the path of the Charleroi and against that vessel and its barges. As the Charleroi reached a point parallel with and approximately 75–100 feet distant from the port side of the Queen City, this hydraulic turbulence caused the Charleroi to list sharply to port, breaking the left facing wire and the center wire connecting it to the loaded barge ahead. As a result the vessel filled with water, righted itself temporarily, and started to sink. At a distance approximately 100 feet further down river, it sank and came to rest on the bed of the channel, having been dragged that distance by the momentum of the barges to which it was still attached by one facing wire.

We find that in all the circumstances then and there existing, it was foreseeable that the maneuver executed by the Queen City in the narrow and shallow channel would likely injure and damage the Charleroi and its tow; that the captain was guilty of a statutory fault in violating 33 C.F.R. § 95.11, as well as gross negligence approaching willful misconduct;[2] and that said statutory fault,

as well as his negligence, was the proximate cause of the sinking of the Charleroi and the resulting damage.

We find no negligence on the part of the pilot or crew of the Charleroi. We find no unseaworthiness of the Charleroi or of its equipment.

The tow and the Charleroi were promptly salvaged. The damage to the libelant has been stipulated at $39,623.00, for which the respondents are liable with interest at 6% from September 23, 1963.

This opinion shall be deemed to embody findings of fact and conclusions of law as required by Rule 46½, Admiralty Rules, 28 U.S.C.A.

2. Cf. Lie v. San Francisco & Portland S.S. Co., 243 U.S. 291, 298, 37 S.Ct. 270, 61 L.Ed. 726 (1917); The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 136, 22 L.Ed. 148 (1873); Sinclair Refining Company v. Morania Dolphin, 170 F. Supp. 586 (S.D.N.Y.1959), aff'd per curiam, 272 F.2d 192 (2d Cir. 1959). In the last cited case, the Pennsylvania rule was applied even though there was no actual physical contact between the vessels involved.