IRA S. BUSHEY & SONS, INC., Plaintiff,

v.

UNITED STATES of America, Defendant.

UNITED STATES of America, Plaintiff,

v.

IRA S. BUSHEY & SONS, INC., Defendant.

Nos. 63 Ad. 432, 64 Ad. 330.

United States District Court
E. D. New York.

Oct. 13, 1967.

---

21. See F.R.Civ.Proc. 8(c).

520

Foley & Martin, New York City, for Ira S. Bushey & Sons, Inc., Christopher E. Heckman, New York City, of counsel.

Joseph P. Hoey, U. S. Atty., for the Eastern District of New York, Louis E. Greco, Atty. in Charge, Admiralty and Shipping Section, Dept. of Justice, New York City, for the United States, Philip A. Berns, Peter M. Klein, New York City, of counsel.

## OPINION

WEINSTEIN, District Judge.

An intoxicated seaman opened several floodgate valves of the floating drydock on which his ship, the 210 foot U. S. Coast Guard vessel Tamaroa, was being overhauled. Within the hour, the drydock sank and the ship fell over on its side. Ira S. Bushey & Sons, Inc. seeks $750,000 from the United States for the resulting damage to its drydock and the United States seeks twice that sum from Bushey as compensation for damage to the vessel. For the reasons indicated below, the United States is liable.

## I. FACTS

Pursuant to contract, the Tamaroa sailed into one of Bushey's wooden drydocks in Gowanus Canal, Brooklyn. Bushey's men raised the drydock by pumping water out of its tanks, using valve controls located on the drydock's walls. The ship then rested on blocks on the drydock floor, permitting its drive shaft to be removed and hull repairs to be made.

Officers and crew continued to live aboard the vessel, assisting with painting and supervising repairs. Access to the ship was provided by a route past the yard's security guard at the gate to the

Bushey shipyard, through the yard, up a ladder to the top of one drydock wall and along the wall to a gangway leading to the fantail deck of the ship. On the fantail was a quartermaster's shack where men returning from leave reported.

Seaman Lane, a member of the Tamaroa's crew, returned from shore leave shortly past midnight on March 14, 1963. His prior record in the Coast Guard was unblemished and he had received a superior efficiency rating from the captain of the Tamaroa. For reasons not made clear, while he was on the drydock wall leading to the gangway, he turned three large wheels which controlled flooding of the tanks on one side of the drydock. Each heavy wheel was turned some twenty times, requiring a sustained and deliberate effort. That his act caused the sinking of the drydock and the consequent capsizing of the Tamaroa cannot be doubted.

At eleven minutes after midnight the ship's quartermaster logged Lane aboard, making mental note of the fact that Lane had been drinking and was "loose." Lane, even in his inebriated condition, evidently realized the possible serious consequences of his action. Shortly after he boarded the ship, he attempted to tell two members of the crew what he had done. In the mess hall he mumbled to an off-duty seaman that he had "turned some valves;" this crew member "figured he was joking" and ignored him. A seaman who was standing the engineering watch and inspecting equipment in the engine room cut off a statement about the "valves" and walked away from Lane because he was "drunk."

Less than ten minutes after Lane came aboard, at 12:20 A.M., water was discovered coming into the drydock by a member of the Tamaroa's crew. By 12:30 A.M. the ship began to list, the alarm was sounded and the crew was ordered to muster ashore. Awakened in his cabin at approximately 12:35 A.M., the captain was told to "hurry" and get off the ship "or it will be too late." By 12:40 A.M., the vessel and dock were listing over 20 degrees. Ten minutes later, at 12:50 A.M., the ship slid off the blocks and fell against the drydock wall.

The officers and crew of the Tamaroa acted with admirable dispatch and decisiveness in abandoning the ship. Had they not moved as quickly as they did, serious injury, perhaps loss of life, would have resulted.

Once on shore, the ship's officers immediately notified the shipyard's security guard and asked that pumping of the sinking drydock be started. The guard notified Bushey's other personnel, but no steps to check further listing were taken.

## II. BUSHEY'S CLAIM AGAINST THE UNITED STATES

### A. *Theory of Action*

#### 1. *Waiver of Immunity; Jurisdiction*

■■ Bushey mistakenly seeks relief pursuant to the Public Vessels Act. 46 U.S.C. §§ 781–790. This Act waives governmental immunity and permits a "libel in personam in admiralty" against the government "for damages caused by a public vessel of the United States." See also 46 U.S.C. § 740 (injury "caused by a vessel"). Reliance should have been upon the Federal Tort Claims Act—subdivision (b) of section 1346 of title 28 of the United States Code. Waiver of immunity under the latter Act is based upon torts of government employees acting within the scope of their employment; it grants:

"* * * district courts * * * exclusive jurisdiction of civil actions on claims against the United States, for money damages * * * for injury or loss of property * * * caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment * * *."

The exclusion from the Federal Tort Claims Act of "any claims for which a remedy is provided by sections * * * relating to claims * * * in admiralty

against the United States" would not be applicable since no such remedy is provided. 28 U.S.C. § 2680(d).

 The Public Vessels Act is primarily designed to permit recovery against the United States when one of its ships is improperly operated and causes damage as by a collision. See Gilmore and Black, The Law of Admiralty, 776 (1957) (the "most natural usage" is "physical damages arising out of her operation."). While damage to the dry-dock was literally "caused" by the Tamaroa "colliding" with the dock, the Tamaroa was not, in a practical sense, a ship causing a "collision," but an inert mass. See Gilmore and Black, 30 ("perhaps the best approximation would be to say that the term 'vessel' is applied to floating structures capable of transporting something over the water"). At the time of the accident she was in drydock on blocks, her machinery inoperative, her watertight doors blocked by lines running through them, her hull open and her shaft removed.

Seaman Lane's opening of valves on a structure other than his ship was the primary cause of the accident. Analytically the situation would have been no different had the drydock been pierced by a nearby bulkhead rather than by the ship. Cases holding that a ship in drydock is "in navigation" for purposes of workmen's compensation are not helpful. See Carumbo v. Cape Cod S.S. Co., 123 F. 2d 991 (1st Cir. 1941); Hunt v. United States, 17 F.Supp. 578 (S.D.N.Y.1936), aff'd per curiam, 91 F.2d 1014 (2d Cir.), cert. denied, 302 U.S. 752, 58 S.Ct. 271, 82 L.Ed. 581 (1937).

 The mere fact that the damage was done by a member of the ship's crew does not warrant application of the admiralty statute. A sailor's conduct may not be sufficiently attributable to his ship to support a finding that the ship caused the resulting damage, yet still be "within the scope of his employment" as that phrase is used in the Federal Tort Claims Act. "Maritime torts of employees of the United States, as distinguished from the torts of vessels of the United States, were intended to be covered by the Federal Tort Claims Act." Jayson, Handling Federal Tort Claims §§ 7.01, 257 (collects cases). See Moran v. United States, 102 F.Supp. 275, 277 (D. Conn.1951). The personification theory and fiction of maritime law that a ship, apart from the men who operate it, is responsible for damage offers no help in this case. Cf. In the Matter of the Petition of Den Norske Amerikalinje A/S, 276 F.Supp. 163 (N.D.Ohio, Oct. 27, 1967) (ship owner held personally liable for punitive damages on basis of captain's reckless and wanton misconduct); Gilmore and Black, The Law of Admiralty 510 (1957) ("It may be concluded that the fiction of ship's personality has never been much more than a literary theme. . . . Since then [the turn of the century] even as literature it has fallen into disrepute"); Note, 77 Harv.L.Rev. 1122, 1125 (1964) ("in rem admiralty actions [should] be analyzed in terms of policy, not metaphor. . . . Indeed, the pattern of results suggests that courts have tacitly been weighing the interests, the tag of personification being added only in those cases in which the balancing favors in rem liability.").

The government also urges the court to find that waiver of immunity rests on the ship's act (46 U.S.C. § 740) rather than on the seaman's tort (28 U.S.C. § 1346 (b)) because, under the former, doctrines of limitation of liability come into play. See, e. g., 46 U.S.C. § 183; cf., Wyandotte Transportation Co., v. United States, 389 U.S. 191, 88 S.Ct. 379, 389 n. 22, 19 L.Ed.2d 407 (1967) (liability of owner for costs of removing negligently sunk vessel not limited to value of vessel). It is quite possible that a ship owner may be liable for greater damage when a sailor—while remaining within the outer limits of scope of employment—departs so substantially from consideration of his ship's welfare as to preclude us from saying that the ship caused the damage. If there must be a ceiling on liability—a doubtful proposition as a

matter of policy—perhaps the concepts of maritime limitations in title 46 can be imported into title 28 torts to avoid incongruities of this kind. But, this is a matter to which we need not now address ourselves since in the present case the value of the Coast Guard vessel exceeds the government's liability.

### 2. *Change of Theory*

■ Under modern notions of procedure, the court deems Bushey's claim for relief as arising under the Federal Tort Claims Act. As the Advisory Committee on Admiralty Rules of the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States indicated in its note to rule 1 of the Rules of Civil Procedure, the 1965 unification of admiralty and civil rules was designed to "abolish the distinction between civil actions and suits in admiralty." Even before unification, a change of theory would not lead to loss of jurisdiction. As one court put it, although "the United States [has] . . . been sued on the wrong side of the docket, it is [not] entitled to have the suit against it dismissed." Steamtug Aladdin, Inc. v. City of Boston, 163 F.Supp. 499, 501 (D. Mass.1958). "The courts have evinced a liberal attitude in permitting amendment of the pleadings so as not to prejudice a claimant who has made the wrong choice in his theory of the action, as where he has brought suit under the Tort Claims Act when he should have proceeded under the admiralty statute—or in the reverse situation where he has instituted the action on the admiralty side of the docket rather that the law side." Jayson, Handling Federal Tort Claims, § 257 (1966). See Steamtug Aladdin, Inc. v. City of Boston, 163 F.Supp. 499 (D.Mass. 1958) ("The error is technical. No one has been prejudiced by the mistake.").

### 3. *Choice of Law*

■ The Federal Tort Claims Act provides that the United States shall be liable for the negligence or wrongful acts of its employees "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). The term "place" means the political entity in which the tortious act occurred—here New York State—and not the navigable canal where the dock was moored. Hess v. United States, 361 U.S. 314, 318, n. 7, 80 S.Ct. 341, 345, n. 7, 4 L.Ed. 2d 305 (1960). The "whole law of the State where the act or omission occurred" is applicable—and this law includes a state's rules on choice-of-law. Richards v. United States, 369 U.S. 1, 11, 82 S.Ct. 585, 592, 7 L.Ed.2d 492 (1962). Since the states must apply federal maritime law to torts of this kind occurring on navigable waters, we are led by this round-about route back to maritime substantive law as determinative of the liabilities of the parties. See Hess v. United States, 361 U.S. 314, 316, 80 S.Ct. 341, 4 L.Ed.2d 305 (1960) ("Since death occurred on navigable waters * * * Oregon would be required * * * to look to maritime law in deciding it"); Gilmore and Black, The Law of Admiralty, 382 (1957).

There is no inconsistency in a federal court's denying competence to admiralty while applying maritime law. Romero v. International Terminal Operating Co., 358 U.S. 354, 360, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959). Although the terms are often used interchangeably, generally "admiralty" refers to a specialized tribunal and practice in litigation—adjective or remedial law—while "maritime law" defines and regulates conduct outside of courts—substantive law.

### B. *Liability*

■ Under the Federal Tort Claims Act, the government waives sovereign immunity and consents to be sued "for injury or loss of property * * * caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment * * * under circumstances where * * * a private person * * * would be liable." 28 U.S.C. § 1346(b). " 'Acting within the scope of his office or employment', in the case of a member of the military

or naval forces of the United States, means acting in line of duty." 28 U.S.C. § 2671. In effect, under this statute, the government may be held vicariously liable for the torts of its employees—both civilian and military—in the same manner as a private employer under the doctrine of respondeat superior.

Bushey advances three possible grounds for the imposition of vicarious liability: (1) the negligence of the engineering watch in failing to take any action after Lane sought to confess what he had done; (2) the negligence of the ship's officers in failing to supervise a member of their crew properly; and (3) the intentional tort committed by Seaman Lane in opening the drydock's flood gate valves and in failing to close them.

### 1. *Failure to Listen to Lane*

The member of the engineering division who was on duty and responsible for the engineering safety of the ship should have been more alert to the possibility of danger when the intoxicated Seaman Lane pursued him and attempted to tell him that he "turned some valves." If he had investigated at once he might have discovered what Lane had done. When the ship began to list, the possibility that Lane might be involved should have occurred to him. Nevertheless, even if he had then begun an investigation, with events moving so swiftly, it is unlikely that he would have discovered the danger in time to successfully undertake corrective measures. It would have been unwise to begin checking and turning the various valves on the drydock. The officers and crew had no precise knowledge of what these valves were designed to do; by tampering with them they might only have increased the rate of sinking while jeopardizing their own lives. Negligence in failing to listen to and act upon Lane's fuddled statements were not proximate causes of damage to the drydock.

### 2. *Failure to Control Lane*

The second possible basis for imposing liability on the government rests on the alleged negligence of the Tamaroa's officers in failing to exercise proper control over the ship's crew. An employer is under a duty to prevent his employees from engaging in tortious conduct, even if such conduct is clearly beyond the scope of their employment, if the conduct is "so connected with the employment in time and place as to give the master a special opportunity to control" it. Harper and Kime, The Duty to Control the Conduct of Another, 43 Yale L.J. 886, 896 (1934). See, e. g., Fletcher v. Baltimore & Potomac R. R. Co., 168 U.S. 135, 18 S.Ct. 35, 42 L.Ed. 411 (1897) (railroad held liable when employee threw a log from a passing train which struck plaintiff); S. Birch & Sons v. Martin, 244 F.2d 556 (9th Cir.), cert. denied, 355 U.S. 837, 78 S.Ct. 62, 2 L.Ed. 2d 49 (1957) (motorist assaulted by off-duty highway construction workers who were intoxicated). In *S. Birch & Sons*, employees had just completed a major portion of a construction job and were intoxicated. Supervisory personnel should have exercised control over these employees even after working hours to protect persons in the construction zone. A passing motorist beaten up by the workers sought recovery against the employer; liability, the court declared, could have been based upon "a showing that the employer knew or should have known of the necessity for exercising * * * control." Id. at 561.

In the present action, the Coast Guard undoubtedly had a duty to take precautions to prevent its men from damaging Bushey property. Bushey consented to the Coast Guard's request that the crew of the Tamaroa be allowed to remain on board while the ship was in drydock. The Tamaroa's crew were given access to the shipyard without any effective power on the part of Bushey to control them. Yet no precautions were taken by the Tamaroa's officers to insure that property was not damaged by crew members returning from shore leave. The captain testified that no special instruction was given to the crew not to touch Bushey equipment Even when

Seaman Lane returned to the ship in an obviously intoxicated state, no one checked to see if he had done any damage.

Nonetheless, it is unlikely that reasonable protective measures would have prevented Lane from acting as he did. Even if warnings were necessary for untrained and unreliable seamen, Lane fell into neither category. The law should not compel officers to lead sailors back to the ship by the hand or to watch every move they make as they wend their way through a shipyard. The relationship between officers and crew on naval and coast guard vessels is based upon mutual respect and confidence. Precautions adequate to prevent aberrations such as Lane's would be demeaning to all personnel and might have a disastrous impact on morale. Negligence in failing to closely control sailors returning from shore leave was not a proximate cause of damage to the drydock.

### 3. *Intentional Act of Lane Within Scope of Employment.*

We turn to the issues which are decisive of this case—(a) whether the government has waived immunity for suits based upon intentional torts of employees, and (b) whether Seaman Lane was acting within the scope of his employment when he opened and left open the flood gate valves on the Bushey drydock. Both these questions must be answered in the affirmative.

### (a) *Intentional Torts*

A preliminary question is whether Seaman Lane's conduct was a "negligent or wrongful act or omission" within the meaning of subdivision (b) of section 1346 of title 28. Section 2680 of that title excludes from the coverage of section 1346 some, but not all, intentional torts. It reads:

"The provisions of * * * section 13⁄ ʻb) of this title shall not apply to—

. . .

(h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights."

The detailed listing and the absence of general terms suggests that only the torts mentioned are to be excluded. As the Supreme Court has stated, section 1346 "provides for liability for 'wrongful' as well as 'negligent' acts * * * the addition of this word was intended to include situations * * * involving 'trespasses' which might not be considered strictly negligent." Hatahley v. United States, 351 U.S. 173, 181, 76 S.Ct. 745, 751–752, 100 L.Ed. 1065 (1956) (wrongful destruction of Indian's horses by government agents); Jayson, Handling Federal Tort Claims, § 214.04, at p. 52 (Supp.1966) ("The word 'wrongful' was added to an earlier phraseology so as to enlarge the coverage beyond 'negligence' "); id., § 214.04 (1966). Cf. B. C. Morton International Corp. v. FDIC, 305 F.2d 692 (1st Cir. 1962) (allegations that corporate agency of government issued press release for the specific purpose of destroying plaintiff's business stated cause of action). A trespass of the kind committed by Lane is covered by the Federal Tort Claims Act.

### (b) *Scope of Employment*

As already noted, the substantive law applicable in this case is federal maritime law. While of ancient lineage, this field of federal common law has responded readily to current trends and needs. The United States Supreme Court has emphasized the necessity of eliminating unjustifiable discriminations. See, e. g., Waldron v. Moore-McCormack Lines, 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967); Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 543–549, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960). It has, for example, considered "the broad remedial purpose of the doctrine of unseaworthiness" to arrive at "a complete divorcement of unseaworthiness liability from concepts of negligence," eliminated distinctions between harm based on faulty equipment and improper use of sound

equipment, and extended liability for unseaworthiness to "longshoremen performing seamen's work." Waldron v. Moore-McCormack Lines, 386 U.S. 724, 726, 728, 87 S.Ct. 1410, 1411, 1412, 18 L.Ed.2d 482 (1967). "The harsh rule of the common law" has received even less homage in maritime cases than in shore based litigation. Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 408–409, 74 S.Ct. 202, 204, 98 L.Ed. 143 (1954).

■■ Federal courts, in deciding "controversies arising under the maritime law," have the same "creative function" in the "formulation of plainly substantive rules of law" as do state judges in matters of their spheres of competence. Hill, The Law-Making Power of the Federal Courts: Constitutional Preemption, 67 Colum.L.Rev. 1024, 1025 (1967). "Where there are no specific * * * decisions on the point, federal judges may turn to the general doctrines of accepted tort law, whence * * * judges derive their governing principles in novel cases." Dalehite v. United States, 346 U.S. 15, 45, 53, 73 S.Ct. 956, 977, 97 L.Ed. 1427 (1953) (dissent).

■■■ Under the general doctrine of respondeat superior, an employer is liable for the intentional torts of his employees "so reasonably connected with the employment as to be within its 'scope'." Prosser, Law of Torts, 476 (3d ed. 1964). The modern trend has been to enlarge the employer's responsibility; liability may be imposed even when the employee's conduct is unauthorized or contrary to his employer's explicit instructions. See, e. g., Dilli v. Johnson, 71 App.D.C. 139, 107 F.2d 669 (D.C. Cir. 1939) ("It is well established that an employer may be held responsible in tort for assaults committed by an employee while he is acting within the scope of his employment, even though he may act wantonly and contrary to his employer's instructions."); Seavey, Law of Agency, 155 (1964); Prosser, 476; 2 Harper and James, The Law of Torts, 1389–1392 (1956).

The proper test for determining when intentionally wrongful conduct falls within the "scope" of the employment is not clear. Reviewing the cases arising under the Federal Tort Claims Act, Judge Sobeloff aptly noted "that the pattern" of the cases "is somewhat confused." Cooner v. United States, 276 F.2d 220, 223 (4th Cir. 1960) (government liable when soldier traveling in private car with family en route to new duty station involved in accident).

A widely accepted formulation of the rule is that the employer may be held responsible if the employee was, at least in part, motivated by a desire—no matter how misguided—to further his employer's interests. See, e. g., Prosser, Law of Torts, 476 (3d ed. 1964); 2 Harper and James, The Law of Torts, 1390, (1956) ("Vicarious liability is generally imposed where the wrong is done wholly or partly to further the master's interests."); Restatement 2d, Agency § 228(1) (c). "An act done from a purely personal motive * * * is not in the scope of employment." Seavey, Law of Agency, 155–56 (1964). See, e. g., Prosser, 477; Restatement 2d, Agency § 235; cf., Davis v. Green, 260 U.S. 349, 43 S.Ct. 123, 67 L.Ed. 299 (1922) (railroad engineer shoots conductor—"neither allegations nor proof present the killing as done to further the master's business or as anything but a wanton and wilful act to satisfy the temper or spite of the engineer").

■ Traditional tests of liability based on the employee's motive to assist his employer are undermined by the present rationale for vicarious liability. Liability of an employer is now being recognized as "a rule of policy, a deliberate allocation of a risk." Prosser, Law of Torts, 471 (3d ed. 1964); Meachem, Outlines of the Law of Agency, 244 (1952). As Judge Traynor declared in Johnston v. Long, 30 Cal.2d 54, 61, 181 P.2d 645, 651 (1947):

> "The principal justification for the application of the doctrine of respondeat superior in any case is the fact

that the employer may spread the risk through insurance and carry the cost thereof as part of his cost of doing business."

The gap between the "scope of employment" rule of respondeat superior and the "arising out of and in the course of employment" test of workmen's compensation is rapidly narrowing. See Carr v. Wm. C. Crowell Co., 28 Cal.2d 652, 171 P.2d 5 (1946); Small, The Effect of Workmen's Compensation Trends on Agency-Tort Concepts of Scope of Employment, 11 NACCA L.J. 19 (1953), 12 id. 21 (1953). As Dean Smith noted in Frolic and Detour, 23 Colum.L.Rev. 444, 456 (1923):

> "The justification of both respondeat superior and workmen's compensation is the same—the belief that it is socially more expedient to spread or distribute among a large group of the community the losses which experience has taught are inevitable in the carrying on of industry, than to cast the loss upon a few."

See also Calabresi, Some Thoughts on Risk Distribution and the Law of Torts, 70 Yale L.J. 499, 544–45 (1961).

This shift from abstract concepts of "scope of employment" to more explicit weighing of the practical social effects of the rule has led to wider employer responsibility for employees' conduct. We "are no longer dealing with specific conduct but with the broad scope of a whole enterprise. Further, we are not looking for that which can and should reasonably be avoided, but with the more or less inevitable toll of a lawful enterprise." 2 Harper and James, The Law of Torts, 1376–77 (1956). See United States v. Romitti, 363 F.2d 662 (9th Cir. 1966) (quotes Harper and James with approval).

In negligence cases involving misconduct which did not further the employee's assigned task, the courts have not hesitated to hold the employer liable. See, e. g., Williams v. United States, 352 F.2d 477 (5th Cir. 1965) (soldier brought explosives home which were set off by child; "since the Government authorized Smith to handle simulators in the line of duty, the Government must answer for his careless mishandling of them."); 2 Harper and James, The Law of Torts, 1382–87 (1956). "The same reasons which would justify imposing vicarious liability upon an employer for the negligent wrongs of an employee acting within the scope of his employment would likewise justify imposing vicarious liability upon an employer for the wilful wrongs of an employee acting within the scope of his employment." Hyde v. Baggett Trans. Co., 236 F.Supp. 194, 196 (E.D.Tenn.1964).

This broadened theory of liability has been adopted in a number of maritime cases. Nelson v. American-West African Line, 86 F.2d 730 (2d Cir. 1936), cert. denied, 300 U.S. 665, 57 S.Ct. 509, 81 L.Ed. 873 (1937) (drunken officer assaults seaman); Hiernaux v. M/V Queen City, 244 F.Supp. 511 (W.D.Pa.1965) ("When the Charleroi came into view about 300 feet ahead, the Captain of the Queen City * * * expressed an intention to injure the Charleroi and its tow. Acting thereon * * *"); Marsden, The Law of Collisions at Sea, 54 (11th ed. 1961) (contra). These cases have stretched far in seeking some motive on the part of the employee to serve his employer. Realistically, tortious conduct of the type involved in *Nelson* and *Hiernaux* is motivated primarily by the employee's personal psychic needs rather than by a hope of aiding his employer. See Note, 45 Harv.L.Rev. 342 (1931) ("Yet not infrequently the master is held liable though his servant's motive was purely personal.").

Several courts and commentators have suggested that the emerging test to determine whether an employee's tortious conduct was committed within the scope of his employment is whether the "conduct may fairly be regarded as a risk of [the] master's business," regardless of whether or not the employee acted with an intent to further his employer's in-

terests. Harper and James, The Law of Torts, 1384, 1385, 1387 (1956); Calabresi, Some Thoughts on Risk Distribution and the Law of Torts, 70 Yale L.J. 499, 544 (1961). See Dilli v. Johnson, 71 App.D.C. 139, 107 F.2d 669 (1939) (waiter assaults customer); Hyde v. Baggett Trans. Co., 236 F.Supp. 194 (E. D.Tenn.1964) (defendant's employee assaults plaintiff in course of altercation concerning unloading of goods); Carr v. Wm. C. Crowell Co., 28 Cal.2d 652, 171 P.2d 5, 7 (1946) (contractor's employee assaults subcontractor's employee—"It is not necessary that the assault should have been made 'as a means, or for the purpose of performing the work he * * * was employed to do' * * * Such injuries are one of the risks of the enterprise."); Fields v. Sanders, 29 Cal.2d 834, 180 P.2d 684, 688, 172 A.L.R. 525 (1947) (truck driver assaults motorist in course of altercation following collision; "the fact that the questioned act was unauthorized or, if wrongful, that it was not committed in order to further the interests of the principal, will not show such a departure from the service of the principal as will absolve the latter if the act was committed while the agent was still occupying himself with the principal's business within the scope of his employment."); Conney v. Atlantic Greyhound Corp., 81 Ga.App. 324, 58 S.E.2d 559 (1950) (baggage clerk in bus terminal assaults plaintiff because he is a Negro).

Although preferable to the motive test, it is not particularly helpful to ask whether the conduct and harm are "risks" of the employer's business. For whether the "risk" of an employee's misconduct is assumed by his employer depends upon substantive policy. The question is whether the public weal is better served by a rule shifting responsibility to employers in particular kinds of cases. See, generally, Calabresi, Some Thoughts on Risk Distribution and the Law of Torts, 70 Yale L.J. 497 (1961).

The law may require the cost of the damage caused by the employee's action 1) to be borne by the person whose property or person was damaged or 2) to be shifted to the employee or 3) to be shifted to his employer. Since the employee normally lacks the ability to respond in damages, for the law to shift liability to him is to leave the cost where it lies. As between the employer and the person injured by the employee's conduct in the course of his employment, it would appear to be more equitable and more consistent with the principles underlying vicarious liability to require that the burden rest with the employer.

It is the employer who selects the worker and who may, by suitable supervision, training, psychological testing and considerate treatment, prevent him from acting in a harmful way. Moreover, it is the employer who is responsible for the employee's being at the point where he is able to do the harm. Cf. Bowman v. Home Life Ins. Co. of America, 243 F.2d 331 (3d Cir. 1957) ("Where one of two innocent persons must suffer loss for the fraud of a third, the loss should fall on the one whose act facilitated it.").

As a practical matter, an injured party such as Bushey will have little control over employees sent onto his property. Should he attempt to supervise, exclude or test the employees of others, he would soon run afoul of unions with which he has no direct relationship. He would also put in jeopardy his commercial relations with employers who would rightfully resent an attempt to tell them whom they ought to employ for their own purposes.

Finally, the probability is that in case of injury the employer will be financially more capable of bearing the risk than the person injured—usually an individual. The majority of employed Americans work for government or private enterprises with substantial assets; individuals, who can be expected to be injured, have modest personal resources. Statistical Abstract of the United States, 224, 265, 335, 439 (1967); I 1963 Census of Business, 3–1 (1966). The employer can also normally obtain insurance more cheaply than those who may be injured.

Calabresi, Some Thoughts on Risk Distribution and the Law of Torts, 70 Yale L.J. 499, 544 (1961). The fact that in the case before us the party injured—Bushey—has substantial resources is fortuitous in deciding what would be a fair rule of law.

### (1) Lane's Act Before Coming Aboard

■ Policy as well as precedent support a finding that Seaman Lane was acting within the scope of his employment when he opened the drydock's flood gate valves. The danger that a member of the Tamaroa's crew would in some manner damage Bushey property was inherent in the arrangement between Bushey and the Coast Guard. The following statement by the Second Circuit relating to seamen's brawls is applicable to an intoxicated sailor damaging property:

> "Seamen's brawls are not uncommon either on board ship or off. The confinement of the ship's frame, the forced continuous interaction of the members of a crew, the cramped living conditions, the ennui which often accompanies shipboard routine, are factors which often induce conditions which enflame those who possess short tempers and occasionally even those respected for even temperedness."
> Walters v. Moore-McCormack Lines, 309 F.2d 191 (2d Cir. 1962).

It is not merely the fact that seamen are apt to drink while on leave that leads to liability. If Lane had become intoxicated in a bar and then damaged the bar's property or assaulted another customer, the government would not be held liable. Gordon v. United States, 180 F. Supp. 591 (Ct.Cl. 1960) (soldier stole grenades from his base, then exploded them in a bar while drunk). Nor would the imposition of vicarious liability be warranted if Lane, upon returning to the drydock, recognized the Bushey security guard as his wife's lover and shot him. In neither of these cases is there a sufficient connection between the employee's tortious conduct and his employment to support a finding that he was acting in the course of his employment.

Here, however, Lane had left whatever place of relaxation he had utilized while on leave and returned to the shipyard. He had climbed the wall of the drydock and was alongside his ship approaching the gangway. He had reached a point "proximate to the scope of his employment" where he entered "the principal's business." McConville v. United States, 197 F.2d 680, 684 (2d Cir.), cert. denied, 344 U.S. 877, 73 S.Ct. 172, 97 L.Ed. 679 (1952) (soldier returning in army truck to camp involved in accident after detouring to stop at bars). Although Lane had been granted shore leave the previous afternoon, when the events in question occurred he had already "re-entered" the scope of his employment since he was "reasonably near the authorized space and time limits" and was about to place himself aboard ship where he would be "serving the master's business." Cook v. United States, 240 F. Supp. 353 (D.Or.1964) (collision occurred 72 feet away from gates of Air Force base); Restatement 2d, Agency § 237.

An additional consideration supporting the conclusion that Lane was acting within the scope of his employment is that it was at the government's request that the crew of the Tamaroa was allowed to remain on board while the ship was in drydock. The government cannot, on the one hand, insist on putting its men in a position where they can do great damage, and, on the other hand, seek to disclaim responsibility for their conduct. See Prosser, Law of Torts, 478 ("There has been a tendency in the later cases * * * to allow recovery on the ground that the employment has provided a peculiar opportunity and even incentive for such loss of temper.") (collects cases); cf. Bowman v. Home Life Insurance Co. of America, 243 F.2d 331 (3d Cir. 1957) (field underwriter, who was not a doctor, posed as one when he called on female applicants for insurance); Restatement 2d, Agency §§ 261, 262. See also Harper and James, The Law of Torts, 1391 (1956)

("The relationship between the master and plaintiff may be such as to put on the master a duty of protective care that he may not delegate.").

### (2) *Failure of Lane to Act After Coming Aboard*

Even if it be assumed that Lane was not acting within the scope of his employment while he was approaching the gangway, there can be no doubt that once he came aboard and was logged in by the quartermaster he became a responsible member of the ship's crew. Any subsequent act or failure to act was within the scope of his employment. McConville v. United States, 197 F.2d 680, 684 (2d Cir.), cert. denied, 344 U.S. 877, 73 S.Ct. 172, 97 L.Ed. 679 (1952); Restatement 2d, Agency, § 237; 2 Harper & James, The Law of Torts, 1386 (1956).

A member of the crew with special knowledge of danger must promptly and clearly report that danger to responsible officers or take appropriate action to prevent damage. Petition of Marina Mercante Nicaraguense, 364 F.2d 118 (2d Cir. 1966), cert. denied, 385 U.S. 1005, 87 S.Ct. 710, 17 L.Ed.2d 544 (boatswain negligent in failing to report that tug alongside was listing); United States v. Lawter, 219 F.2d 559 (5th Cir. 1955) (crew member of helicopter failed to inform pilot or other crewman that person being rescued was not adequately secured); Ford Motor Co. v. Manhattan Lighterage Corp., 97 F.2d 577 (2d Cir. 1938) (deckhand at fault for failing to put out an additional line when he realized one line was insufficient). Failure to take corrective action is conduct within the scope of employment. Restatement 2nd, Agency § 232, comment d.

A proper report by Lane between 12:11, when he came aboard, and 12:30 should have led to immediate action by the ship's officers and crew to close the drydock valves. If Lane was not aware of the possible result of his act when he opened the valves, he should have realized the danger when the ship began to list at about 12:25. His attempt

to warn fellow crew members was not sufficiently clear or forceful to exhaust his responsibilities. The government is hardly in a position to excuse Lane's inept actions on board the ship on the ground that he, a member of the crew on board a commissioned vessel of the Coast Guard, was intoxicated.

Even had he failed to get the immediate attention of an officer or alert crew member, Lane should have himself turned back the wheels as he left the ship. It was necessary for him to pass them as he went ashore. They could have been turned by him within a few moments, and the closing of the valves would have immediately prevented any further listing of the drydock. Such action taken by him between 12:30 and 12:40, while the ship was being abandoned, would have created—as he should have known—no increase in danger. It would have prevented damage to the ship and drydock since the ship did not capsize until 12:50.

### III. BUSHEY'S ALLEGED NEGLIGENCE

Bushey is alleged to have been negligent in two respects: first, in using a fifty-year-old drydock with hand-operated and unlocked valves and, second, in failing to have on hand men able to start the pumps in an emergency. Both of these contentions are lacking in merit.

The government chose the Bushey shipyard, presumably after it had advised itself of the equipment used there. The equipment was in good operating condition. There was no reason to modify the valves so that they would be locked, especially since the system had worked well for so many years. The only persons having access to the drydock walls, so far as the evidence indicated, were members of the shipyard—who presumably would be either trained in their use, or have enough sense to leave them alone—or officers and crew from vessels in the yard.

It was reasonable for Bushey to assume that sailors who have received Coast Guard schooling and are aboard

commissioned ships of the Coast Guard will have enough professional insight and common sense not to indiscriminately turn valves on a floating conveyance such as a drydock. They were not tourists, but seamen trained to treat a vessel and all its appurtenances with the respect due an object upon whose safe workings their lives depend. The traditions of the sea are still strong enough to make reasonable the shipyard's assumption that sailors will not deliberately foul maritime equipment.

Nor was the shipyard liable for failing to have on hand men able to start the pumps in any emergency. The shipyard had a security force inspecting the yard during the night and keeping strangers out. That security force took immediate steps to notify those in the shipyard who had authority to start the pumps. The evidence indicates that it would not have been reasonable or useful to send shipyard employees out on the drydock after the ship had been abandoned and the ship's officers notified the yard's security watch of the situation. At that time the list was over 20 degrees and there was imminent danger that the ship would slide off the blocks. The hazard to the men who would have had to go onto the walls to manipulate valves was too great. No precaution which the shipyard might reasonably have been expected to take would have prevented the damage which occurred.

## IV. GOVERNMENT'S CLAIM AGAINST BUSHEY

The government seeks to recover for the damage to the Tamaroa even though it was one of its own employees who deliberately caused the condition for which it claims damages. Jurisdiction to hear the claim of the United States as plaintiff is clear. 28 U.S.C. § 1345. Since this Court finds that Bushey was not negligent, the government's libel must be dismissed.

## V. CONCLUSION

The government's libel is dismissed. The Court finds the United States liable for damage to the drydock of Bushey. A hearing will be held to fix the amount of damage.

So ordered.