**IRA S. BUSHEY & SONS, INC.,**
Plaintiff-Appellee,

v.

**UNITED STATES of America,**
Defendant-Appellant.

**No. 463, Docket 32086.**

United States Court of Appeals
Second Circuit.

Argued April 30, 1968.

Decided June 19, 1968.

Philip A. Berns, Washington, D. C., (Edwin L. Weisl, Jr., Asst. Atty. Gen., Joseph P. Hoey, U. S. Atty., Louis E. Greco, Atty. in Charge, New York Office, Admiralty and Shipping Section, Peter M. Klein, Atty., Admiralty and Shipping Section, Dept. of Justice), for the United States, appellant.

Christopher E. Heckman, New York City, Foley & Martin, New York City, for appellee Ira S. Bushey & Sons, Inc.

Before WATERMAN, FRIENDLY and KAUFMAN, Circuit Judges.

FRIENDLY, Circuit Judge:

While the United States Coast Guard vessel Tamaroa was being overhauled in a floating drydock located in Brooklyn's Gowanus Canal, a seaman returning from shore leave late at night, in the condition for which seamen are famed, turned some wheels on the drydock wall. He thus opened valves that controlled the flooding of the tanks on one side of the drydock. Soon the ship listed, slid off the blocks and fell against the wall. Parts of the drydock sank, and the ship partially did—fortunately without loss of life or personal injury. The drydock owner sought and was granted compensation by the District Court for the Eastern District of New York in an amount to be determined, 276 F.Supp. 518; the United States appeals.[1]

Before reaching the merits, we must deal with a procedural issue injected by the district judge, since we would have no jurisdiction of the appeal if his decision of the question was correct. Although Bushey, the drydock owner, had brought its libel under the Public Vessels Act, 46 U.S.C. §§ 781–790, and the United States did not dispute the applicability of that statute save for unsuccessfully contending that Bushey must first present its claim to the Coast Guard Board of Contract Appeals,[2] the judge ruled that the damage to the drydock was not "caused by a public vessel of the United States" since "the Tamaroa was not, in a practical sense, a ship causing a 'collision,' but an inert mass." 276 F.Supp. at 523. He then proceeded to hold (1) that sovereign immunity was nevertheless waived under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2674, the exception in § 2680(d) for "any claim for which a remedy is provided by sections 741–752, 781–790 of Title 46, relating to claims or suits in admiralty against the United States" being inapplicable because, as he believed, no such remedy was provided; (2) that Bushey's pleading would be deemed amended to allege a claim under the Tort Claims Act which it had not asserted; (3) that New York law applied, 28 U.S.C. § 1346(b); (4) that this, however, was the "whole" law of New York; and (5) that New York would, indeed must, determine liability for a tort on navigable waters in accordance with maritime law. Hence, from a substantive standpoint, the chase was thought to have ended where it began, save for a caveat as to the applicability of distinctive admiralty remedies, notably limitation, an issue not practically important here.

---

1. The district court also dismissed a libel by the United States against the drydock owner for damage to the vessel; the United States has not appealed from that ruling.

2. This contention has not been pressed on appeal.

What does remain important is that our powers to review a judgment determining liability but not fixing damages are entirely different if the action was in admiralty as the parties thought or at law as the judge held. If it was the former, we have jurisdiction under 28 U.S.C. § 1292(a) (3) relating to "interlocutory decrees * * * determining the rights and liability of the parties to admiralty cases in which appeals from final decrees are allowed," whereas if it were the latter, we would have none. Beebe v. Russell, 60 U.S. (19 How.) 283, 285, 15 L.Ed. 668 (1856); Catlin v. United States, 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945).

We perceive no basis for the court's restrictive reading of the Public Vessels Act. It is no strain whatever on the language to say that a public vessel has "caused" any tort damage for which she is legally responsible. Thomason v. United States, 184 F.2d 105 (9 Cir. 1950). The Act speaks of causing "damage"; it says nothing about causing "collision." Such debate as there has been concerning the scope of the Public Vessels Act relates to claims sounding in contract, see Calmar S. S. Corp. v. United States, 345 U.S. 446, 456 n. 8, 73 S.Ct. 733, 738, 97 L.Ed. 1140 (1953), and even as to that "equivocal language should be construed so as to secure the most harmonious results." Id. Furthermore, and decisively, even if the judge's narrow reading of § 1 of the Public Vessels Act had been warranted, the suit could nevertheless be maintained under § 2 of the Suits in Admiralty Act as amended, 46 U.S.C. § 742. This provides, *inter alia*, that in cases where if any vessel owned by the United States "were privately owned or possessed, * * * a proceeding in admiralty could be maintained, any appropriate nonjury proceeding in personam may be brought against the United States * * *."— the language of the 1920 statute restricting the Suits in Admiralty Act to merchant vessels having been stricken in 1960, 74 Stat. 912, for the very purpose of avoiding fruitless jurisdictional controversies and bringing all maritime claims against United States vessels into the admiralty jurisdiction of the district courts. See S.Rep. 1894, 86th Cong. 2d Sess., 2 U.S. Code Cong. & Adm. News, p. 3583 et seq.[3]

With our appellate jurisdiction under 28 U.S.C. § 1292 (a) (3) thus established, we return to the facts. The Tamaroa had gone into drydock on February 28, 1963; her keel rested on blocks permitting her drive shaft to be removed and repairs to be made to her hull. The contract between the Government and Bushey provided in part:

(o) The work shall, whenever practical, be performed in such manner as not to interfere with the berthing and messing of personnel attached to the vessel undergoing repair, and provision shall be made so that personnel assigned shall have access to the vessel at all times, it being understood that such personnel will not interfere with the work or the contractor's workmen.

Access from shore to ship was provided by a route past the security guard at the gate, through the yard, up a ladder to the top of one drydock wall and along the wall to a gangway leading to the fantail deck, where men returning from leave reported at a quartermaster's shack.

Seaman Lane, whose prior record was unblemished, returned from shore leave a little after midnight on March 14. He had been drinking heavily; the quartermaster made mental note that he was "loose." For reasons not apparent to us or very likely to Lane,[4] he took it into his head, while progressing along the gangway wall, to turn each of three large

---

3. The discussion in Gilmore & Black, Admiralty, § 11–11 (1957), which the judge cited, 276 F.Supp. at 523, is thus largely obsolete—a good instance of the compelling need for a revised edition of this indispensable work.

4. Lane disappeared after completing the sentence imposed by a courtmartial and being discharged from the Coast Guard.

wheels some twenty times; unhappily, as previously stated, these wheels controlled the water intake valves. After boarding ship at 12:11 A.M., Lane mumbled to an off-duty seaman that he had "turned some valves" and also muttered something about "valves" to another who was standing the engineering watch. Neither did anything; apparently Lane's condition was not such as to encourage proximity. At 12:20 A.M. a crew member discovered water coming into the drydock. By 12:30 A.M. the ship began to list, the alarm was sounded and the crew were ordered ashore. Ten minutes later the vessel and dock were listing over 20 degrees; in another ten minutes the ship slid off the blocks and fell against the drydock wall.

The Government attacks imposition of liability on the ground that Lane's acts were not within the scope of his employment. It relies heavily on § 228(1) of the Restatement of Agency 2d which says that "conduct of a servant is within the scope of employment if, but only if: * * * (c) it is actuated, at least in part by a purpose to serve the master." Courts have gone to considerable lengths to find such a purpose, as witness a well-known opinion in which Judge Learned Hand concluded that a drunken boatswain who routed the plaintiff out of his bunk with a blow, saying "Get up, you big son of a bitch, and turn to," and then continued to fight, might have thought he was acting in the interest of the ship. Nelson v. American-West African Line, 86 F.2d 730 (2 Cir. 1936), cert. denied, 300 U.S. 665, 57 S.Ct. 509, 81 L.Ed. 873 (1937). It would be going too far to find such a purpose here; while Lane's return to the Tamaroa was to serve his employer, no one has suggested how he could have thought turning the wheels to be, even if—which is by no means clear—he was unaware of the consequences.

In light of the highly artificial way in which the motive test has been applied, the district judge believed himself obliged to test the doctrine's continuing vitality by referring to the larger purposes *respondeat superior* is supposed to serve. He concluded that the old formulation failed this test. We do not find his analysis so compelling, however, as to constitute a sufficient basis in itself for discarding the old doctrine. It is not at all clear, as the court below suggested, that expansion of liability in the manner here suggested will lead to a more efficient allocation of resources. As the most astute exponent of this theory has emphasized, a more efficient allocation can only be expected if there is some reason to believe that imposing a particular cost on the enterprise will lead it to consider whether steps should be taken to prevent a recurrence of the accident. Calabresi, The Decision for Accidents: An Approach to Non-fault Allocation of Costs, 78 Harv.L.Rev. 713, 725–34 (1965). And the suggestion that imposition of liability here will lead to more intensive screening of employees rests on highly questionable premises, see Comment, Assessment of Punitive Damages Against an Entrepreneur for the Malicious Torts of His Employees, 70 Yale L.J. 1296, 1301–04 (1961).[5] The unsatisfactory quality of the allocation of resource rationale is especially striking on the facts of this case. It could well be that application of the traditional rule might induce drydock owners, prodded by their insurance companies, to install locks on their valves to avoid similar incidents in the future,[6] while placing the burden on shipowners is much less

---

5. We are not here speaking of cases in which the enterprise has negligently hired an employee whose undesirable propensities are known or should have been. See Koehler v. Presque-Isle Transp. Co., 141 F.2d 490 (2 Cir.), cert. denied, 322 U.S. 764, 64 S.Ct. 1288, 88 L.Ed. 1591 (1943).

6. The record reveals that most modern drydocks have automatic locks to guard against unauthorized use of valves.

likely to lead to accident prevention.[7] It is true, of course, that in many cases the plaintiff will not be in a position to insure, and so expansion of liability will, at the very least, serve *respondeat superior*'s loss spreading function. See Smith, Frolic and Detour, 23 Colum.L.Rev. 444, 456 (1923). But the fact that the defendant is better able to afford damages is not alone sufficient to justify legal responsibility, see Blum & Kalven, Public Law Perspectives on a Private Law Problem (1965), and this overarching principle must be taken into account in deciding whether to expand the reach of *respondeat superior*.

■ A policy analysis thus is not sufficient to justify this proposed expansion of vicarious liability. This is not surprising since *respondeat superior*, even within its traditional limits, rests not so much on policy grounds consistent with the governing principles of tort law as in a deeply rooted sentiment that a business enterprise cannot justly disclaim responsibility for accidents which may fairly be said to be characteristic of its activities. It is in this light that the inadequacy of the motive test becomes apparent. Whatever may have been the case in the past, a doctrine that would create such drastically different consequences for the actions of the drunken boatswain in *Nelson* and those of the drunken seaman here reflects a wholly unrealistic attitude toward the risks characteristically attendant upon the operation of a ship. We concur in the statement of Mr. Justice Rutledge in a case involving violence injuring a fellow-worker, in this instance in the context of workmen's compensation:

"Men do not discard their personal qualities when they go to work. Into the job they carry their intelligence, skill, habits of care and rectitude. Just as inevitably they take along also their tendencies to carelessness and camaraderie, as well as emotional make-up.

In bringing men together, work brings these qualities together, causes frictions between them, creates occasions for lapses into carelessness, and for fun-making and emotional flare-up. * * * These expressions of human nature are incidents inseparable from working together. They involve risks of injury and these risks are inherent in the working environment."

Hartford Accident & Indemnity Co. v. Cardillo, 72 App.D.C. 52, 112 F.2d 11, 15, cert. denied, 310 U.S. 649, 60 S.Ct. 1100, 84 L.Ed. 1415 (1940); cf. Robinson v. Bradshaw, 92 U.S.App.D.C. 216, 206 F.2d 435 (1953). Judge Cardozo reached a similar conclusion in Leonbruno v. Champlain Silk Mills, 229 N.Y. 470, 128 N.E. 711, 13 A.L.R. 522 (1920). Further supporting our decision is the persuasive opinion of Justice Traynor in Carr v. Wm. C. Crowell Co., 28 Cal.2d 652, 171 P.2d 5 (1946) [employer liable for violent acts of servant against employee of a subcontractor working on the same construction job], followed in Fields v. Sanders, 29 Cal.2d 834, 180 P.2d 684, 172 A.L.R. 525 (1947) [employer liable for violent acts of driver against another driver in traffic dispute].

■ Put another way, Lane's conduct was not so "unforeseeable" as to make it unfair to charge the Government with responsibility. We agree with a leading treatise that "what is reasonably foreseeable in this context [of *respondeat superior*] * * * is quite a different thing from the foreseeably unreasonable risk of harm that spells negligence * *. The foresight that should impel the prudent man to take precautions is not the same measure as that by which he should perceive the harm likely to flow from his long-run activity in spite of all reasonable precautions on his own part. The proper test here bears far more resemblance to that which limits liability for workmen's compensation than to the test for negligence. The employer should be held to expect risks, to the public also,

---

7. Although it is theoretically possible that shipowners would demand that drydock owners take appropriate action, see Coase, The Problem of Social Cost, 3 J.L. & Economics 1 (1960), this would seem unlikely to occur in real life.

which arise 'out of and in the course of' his employment of labor." 2 Harper & James, The Law of Torts 1377–78 (1956). See also Calabresi, Some Thoughts on Risk Distribution and the Law of Torts, 70 Yale L.J. 499, 544 (1961). Here it was foreseeable that crew members crossing the drydock might do damage, negligently or even intentionally, such as pushing a Bushey employee or kicking property into the water. Moreover, the proclivity of seamen to find solace for solitude by copious resort to the bottle while ashore has been noted in opinions too numerous to warrant citation. Once all this is granted, it is immaterial that Lane's precise action was not to be foreseen. Compare, for a similar problem in the law of damages, Petition of Kinsman Transit Co., 338 F.2d 708, 721–726 (2 Cir. 1964), cert. denied, Continental Grain Co. v. City of Buffalo, 380 U.S. 944, 85 S.Ct. 1026, 13 L.Ed.2d 963 (1965), but see also 388 F.2d 821 (2 Cir. 1968). Consequently, we can no longer accept our past decisions that have refused to move beyond the *Nelson* rule, Brailas v. Shepard S.S. Co., 152 F.2d 849 (2d Cir. 1945), cert. denied, 327 U.S. 807, 66 S.Ct. 970, 90 L.Ed. 1032 (1946); Kable v. United States, 169 F.2d 90, 92 (2 Cir. 1948),[8] since they do not accord with modern understanding as to when it is fair for an enterprise to disclaim the actions of its employees.

█ One can readily think of cases that fall on the other side of the line. If Lane had set fire to the bar where he had been imbibing or had caused an accident on the street while returning to the drydock, the Government would not be liable; the activities of the "enterprise" do not reach into areas where the servant does not create risks different from those attendant on the activities of the community in general. Cf. Gordon v. United States, 180 F.Supp. 591 (Ct.Cl.1960); Trost v. American Hawaiian S.S. Co., 324 F.2d 225 (2 Cir. 1963), cert. denied, 376 U.S. 963, 84 S.Ct. 1125, 11 L.Ed.2d 981 (1964). We agree with the district judge that if the seaman "upon returning to the drydock, recognized the Bushey security guard as his wife's lover and shot him," 276 F.Supp. at 530, vicarious liability would not follow; the incident would have related to the seaman's domestic life, not to his seafaring activity, cf. Hartford Accident & Indemnity Co. v. Cardillo, supra, 112 F.2d at 17, and it would have been the most unlikely happenstance that the confrontation with the paramour occurred on a drydock rather than at the traditional spot. Here Lane had come within the closed-off area where his ship lay, cf. McConville v. United States, 197 F.2d 680 (2 Cir. 1957), to occupy a berth to which the Government insisted he have access, cf. Restatement, Agency 2d, § 267, and while his act is not readily explicable, at least it was not shown to be due entirely to facets of his personal life. The risk that seamen going and coming from the Tamaroa might cause damage to the drydock is enough to make it fair that the enterprise bear the loss. It is not a fatal objection that the rule we lay down lacks sharp contours; in the end, as Judge Andrews said in a related context, "it is all a question [of expediency,] * * * of fair judgment, always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind." Palsgraf v. Long Island R.R. Co., 248 N.Y. 339, 354–355, 162 N.E. 99, 104, 59 A.L.R. 1253 (1928) (dissenting opinion).

Since we hold the Government responsible for the damage resulting from Lane's turning the wheels, we find it

---

8. The *Brailas* decision relied on Davis v. Green, 260 U.S. 349, 43 S.Ct. 123, 67 L.Ed. 299 (1922), which was applied in St. Louis-San Francisco R. Co. v. Mills, 271 U.S. 344, 46 S.Ct. 520, 70 L.Ed. 979 (1926); Atlantic Coast Line R. Co. v. Southwell, 275 U.S. 64, 48 S.Ct. 25, 72 L.Ed. 157 (1927); and Atlanta & Charlotte Air Line R. Co. v. Green, 279 U.S. 821, 49 S.Ct. 350, 73 L.Ed. 976 (1929). However, we agree with Chief Judge Murrah that the Supreme Court would not follow *Davis* today, despite its author's eminence. Copeland v. St. Louis-San Francisco R. Co., 291 F.2d 119, 121, 123 (10 Cir. 1961) (dissenting opinion).

unnecessary to consider Bushey's further arguments that liability would attach in any event because of later inaction of Lane and others on the Tamaroa; and that in libels *in rem,* whose principles are here applicable by virtue of § 3 of the Suits in Admiralty Act, ordinary rules of agency are inapplicable and the ship is liable for anything ship-connected persons cause it to do. Cf. The China, 74 U.S. (7 Wall.) 53, 19 L.Ed. 67 (1868); Burns Bros. v. Central R.R. of N. J., 202 F.2d 910, 914 (2 Cir. 1953).

Affirmed.