Charles **FOWLER**, Plaintiff,

v.

**NEW YORK CITY DEPARTMENT OF SANITATION; Norman Steisel, individually and in his official capacity as Deputy Commissioner for Administration of the New York City Department of Sanitation; Robert C. Ross, individually and in his official capacity as Director of Personnel of the New York City Department of Sanitation, Defendants.**

**No. 86 Civ. 9138 (MBM).**

United States District Court, S.D. New York.

Jan. 30, 1989.

Minna J. Kotkin, Craig Saunders, Jason Turken, Legal Interns, BLS Legal Services Corp., Brooklyn, N.Y., for plaintiff.

George Gutwirth, Asst. Corp. Counsel, for City of New York, Peter L. Zimroth, Corp. Counsel, New York City, for defendants.

## OPINION AND ORDER

MUKASEY, District Judge.

Concerned about a growing problem of substance abuse among its employees and the attendant danger to the public, the New York City Department of Sanitation (the "Department") introduced, on May 1, 1985, a "Substance Abuse Policy and Procedure" designed to "protect the health and safety of both the public and the Department's work force and to ensure that employees troubled by drug and alcohol abuse problems receive the help they need." The policy established new rules to deal with Department employees who use alcohol of illegal drugs and set up counselling procedures for employees found to be using these substances. Significantly, the Department stated that it did not intend to introduce random tests for substance abuse but would test only: 1) all potential employees as part of their pre-employment physical, and 2) all permanent workers receiving low job performance evaluations or involved in physical altercations, vehicle accidents or vandalism.

Plaintiff Charles Fowler, a probationary employee, was fired by the Department based on positive drug tests showing her-

oin use. He challenges, on various grounds, its policy for testing job applicants and probationary employees for substance abuse. Both parties have moved for summary judgment. For the reasons set forth below, plaintiff's motion is denied and defendants' motion is granted.

### I.

At some point in 1973 or 1974 plaintiff took and passed a New York City Civil Service examination for employment with the Department, but was not hired because he moved his residence without leaving a forwarding address and the Department could not reach him. In 1985, after reading a newspaper article about the discontinuation of the old eligibility list for hiring by the Department, he called and was placed on an existing eligible list. Shortly thereafter the Department contacted him and told him to report for a compulsory pre-employment medical examination at its Medical Division.

According to the Department's employee manual, all candidates are required as part of their pre-employment physical to submit "supervised urine specimens for substance abuse testing" and "sign a statement acknowledging that specific substances found in their urine will disqualify them from employment and/or will lead to termination during their probationary period."

In accordance with this policy, the Department tested plaintiff on February 14, 1986, the day of his pre-employment physical examination. A female attendant escorted him to a bathroom where she watched him urinate into two specimen bottles. There is no evidence that he objected in any way at the time to this procedure. According to the manual's provision for chain of custody, after the two samples are taken, each bottle is labeled with the donor's name, the last four digits of his social

security number, the date, the letter "A" or "B," and the attendant's initials. The specimens are then placed into two separate locked refrigerators. The first sample is sent to a laboratory and tested. If the result is negative no further testing is done. If the result is positive, the second sample is then sent to the laboratory for another round of tests.

Plaintiff's first sample, sample A, was sent to the Laboratory for Chromatography, a private laboratory licensed by the New York State and City Health Departments to conduct toxicology examinations. The sample tested positive for opiates (morphine) on two Enzyme Multiplied Immunoassay Technique ("EMIT") tests. The positive sample was then confirmed for the presence of opiates by a process known as hydrolysis, a method by which the drug in the urine is broken up into its free form by action of acid and is then subsequently tested using the Thin Layer Chromatography method. The "A" sample also tested positive for marijuana. As a result of this positive report, the second sample was then forwarded to the laboratory for a confirming test. The second sample, the "B" portion, tested positive twice for opiates using the EMIT tests but was not reported as positive because hydrolysis could not confirm this result.

In the case of a split result, where only one specimen tests positive, Department policy provides that the employee be notified that there is a "suspicion" of substance abuse and that he will be called in for a randomly timed test.[1] If this test is negative, for both the "A" and "B" portions of the sample, the employee is not required to undergo further testing as he would be if the second test is positive. If both specimens are positive, however, the employee is disqualified from employment

---

1. The policy provides:

"Any employee who *tests positive on only one specimen (e.g., "A" not "B"), or for whom only one specimen is valid or extant,* will be hired and called in for counselling under PAP 85-05. The employee will be notified that there is a 'suspicion' of substance abuse based on the pre-

employment physical examination and that s/he will be called in for a random test. The purpose of this test will be to ascertain whether there is in fact a substance abuse problem. Should this test be negative (both "A" and "B") then the employee's involvement under PAP 85-05 will be ended...." (emphasis in original)

and no further tests are allowed.[2]

The Department tested plaintiff a second time on March 6, 1986. This time a male attendant watched while he provided the sample. Both samples tested negative.

The Department hired plaintiff on March 31, 1986. His training included classroom instruction and driver education in operating various trucks. Upon completion of training, the Department transferred him to sweeping duty. *See* Fowler Dep. at 112–119.

Because of the two contradictory tests, however, Medical Clinic personnel required follow-up tests.[3] On April 28, 1986 plaintiff attended a mandatory counseling session at the Department's Medical Clinic. A counselor told him that he had tested positive for morphine and marijuana and that he would have to pass two further tests with negative results in order to continue in his position. Any positive test during his probationary period would result in termination. At the session, plaintiff signed a form indicating he understood the procedure. The form signed by plaintiff stated:

> Employee counselled regarding the fact that her/his urine specimen was positive for marijuana (THC) on the pre-employment physical examination. PAP 85–05 explained and employee urged to be in compliance, as following today's session (s)he will require two (2) negative toxicology results, to have satisfactorily completed the probationary period as regards to compliance with PAP 85–05. Employee also informed that during the probationary period, a positive test for alcohol and/or toxicology will result in termination.

The purpose and availability of the Employees' Assistance Unit (EAU) discussed, and employee encouraged to become involved if necessary. However, (s)he is aware that if the test results are positive (s)he will be terminated, not withstanding [*sic*] participation in EAU.... The above has been explained and it is understood by me.

On June 12, 1986 the Department tested plaintiff a third time, using both the EMIT and the Thin Layer Chromatography methods. Both the "A" and "B" samples tested positive for morphine and quinine.

Plaintiff went to the Medical Clinic on July 1, 1986 for counseling and was informed of the positive test results. Plaintiff admitted "dabbling" in drugs in the past, apparently because of stress caused by a family problem. *See* Fowler Dep. at 152 (5/8/87). Plaintiff submitted to his fourth and final test, the results of which were negative.

On July 28, 1986 the Department fired plaintiff. In a August 15, 1986 letter, the Department informed him that he was fired for violating the substance abuse policy.

In early 1987, however, plaintiff passed another civil service test and was placed on a second eligible list, from which he was called for employment. In his application, he claimed he was never discharged from employment. Because the Department allows employment to begin before it investigates the applicant, plaintiff again began working on March 23, 1987. Investigation revealed plaintiff's previous dismissal for substance abuse as well as a prior conviction in 1982 for possession of stolen property when he worked for the Human Resources Administration. In April, 1987 the New York City Department of Personnel brought charges against plaintiff, which

---

**2.** In this regard, the policy provides that "[a]ll candidates with a *positive substance abuse result* for any substance other than THC or methadone (for which specific medical guidelines apply), will be disqualified for employment." P.A.P. 85–05 Substance Abuse Manual at 2.

**3.** P.A.P. 85–05, 8.4 provides: "Because all positive tests will be confirmed using a different testing method, in some cases the second test may be negative. The results of both tests will be noted in the employee's medical record. The Clinic will evaluate the employee and will refer him or her to EAU [Employee Assistance Unit]. If EAU's evaluation of the employee's condition indicates that the employee should participate in a treatment program, EAU's judgment will take precedence over the test results. In these cases, the employee will not be allowed to resume normal job duties until he or she participates in treatment. The employee will not be allowed to return to regular duty status until evaluated and found fit by the Medical Director."

resulted in a request for his termination no later than July 17, 1987. Plaintiff has appealed that decision to the New York City Civil Service Commission.

Plaintiff now asserts that the Department's testing policy constituted an unreasonable search and seizure in violation of the Fourth Amendment, applicable to state action through the Fourteenth Amendment and 42 U.S.C. § 1983 (1982), and Article I, section 12 of the New York State Constitution. Plaintiff asserts also that the Department deprived him of due process when it fired him without an opportunity to respond to the charges against him. Further, plaintiff claims his firing violated § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Supp. IV 1986), and N.Y. Exec. Law § 296 *et seq* (McKinney 1986). Finally, he claims that the Department's failure to notify him fully of the test results and to follow internal procedures violated N.Y.Civ.Prac.L. & R. § 7803(3) (McKinney 1986).

Both sides now move for summary judgment. To grant a motion for summary judgment, a court must find that there is no genuine issue as to any material fact. *Celotex v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Although plaintiff presents myriad claims, the bulk of his argument rests on the supposed violation of his Fourth Amendment rights.

## II.

The Fourth Amendment[4] protects against unreasonable searches and seizures by government officials. *Carroll v. United States*, 267 U.S. 132, 147, 45 S.Ct. 280, 283, 69 L.Ed. 543 (1925). This right thus is not a constitutional absolute, but is defined by a standard of reasonableness.

The threshold issue is whether the urinalysis conducted here was a "search" as that term is known to Fourth Amendment case law. Judge Guy of the Sixth Circuit put it

succinctly, dissenting in *Lovvorn v. City of Chattanooga*, 846 F.2d 1539, 1555 (6th Cir. 1988): "[T]here are 'searches' and then again there are 'Fourth Amendment searches.'" Obviously, to the extent government officials here conducted no Fourth Amendment search, there is no occasion to consider whether what they did was "unreasonable." As Judge Guy has noted, this inquiry is to be handled with due care, and with awareness of Justice Harlan's warning in *Katz v. United States*, 389 U.S. 347, 350 n. 5, 88 S.Ct. 507, 510 n. 5, 19 L.Ed.2d 576 (1967), that "the Fourth Amendment cannot be translated into a general constitutional 'right to privacy.' ... Virtually every governmental action interferes with personal privacy to some degree. The question in each case is whether that interference violates a command of the United States Constitution."

In *Katz*, Justice Harlan described a two-step analysis for determining whether a governmental action constitutes a search for Fourth Amendment purposes: "[F]irst that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *Katz*, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring). The Court has cautioned that the objective element of the test should be "emphasized" over the subjective. *Hudson v. Palmer*, 468 U.S. 517, 525 n. 7, 104 S.Ct. 3194, 3199 n. 7, 82 L.Ed.2d 393 (1984). Moreover, the standard of "reasonableness" changes depending on the person involved and the particular circumstances in the case. *See O'Connor v. Ortega*, 480 U.S. 709, 718, 107 S.Ct. 1492, 1498, 94 L.Ed.2d 714 (1987) ("question of whether an employee has a reasonable expectation of privacy must be addressed on a case-by-case basis"); *Committee for GI Rights v. Callaway*, 518 F.2d 466, 476 (D.C.Cir.1975) ("What is reason-

---

4. The Fourth Amendment, applicable to the states through the Fourteenth Amendment, *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), provides that:

    [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issues, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

able in one context may not be reasonable in another").

It is important that the question to be answered in this case not be framed too broadly. If what we are concerned with when we set out to detect the presence of a Fourth Amendment search is whether society will protect an expectation of privacy, then there can be little doubt that compulsory urinalysis in certain circumstances will qualify as a Fourth Amendment search. For example, in *Coppinger v. Metro–North Commuter R.R.*, 861 F.2d 33 (2d Cir.1988), the Second Circuit held that a Metro–North employee sent for immediate blood and urine analysis after supervisors discovered liquor where he and others were taking their lunch break, and subsequently fired when his urine tested positive for cocaine metabolites, opiates and marijuana, had been subjected to a search that was arguably unreasonable if his "employer's suspicion of wrongdoing is not supported by objective facts and those rational inferences that may be drawn from them." 861 F.2d at 35. As that Court pointed out, "A number of our sister circuits have held that compulsory urinalysis of public employees qualifies as a 'search and seizure' within the meaning of the Fourth Amendment." *Id.* (citations omitted). Indeed, most courts that have considered the matter have found, on the facts they treated, that urinalysis is a search. *See Burka v. New York City Transit Auth.*, 680 F.Supp. 590, 604–5 n. 24 (S.D.N.Y.1988) (collecting cases); *see generally* Note, *Random Drug Testing of Government Employees: A Constitutional Procedure*, 54 U.Chi.L. Rev. 1335 (1987). Those courts, and their reasoning, may be divided into two groups. Some compare the test to the taking of an involuntary blood sample which the Supreme Court in *Schmerber v. California*, 384 U.S. 757, 767, 86 S.Ct. 1826, 1833, 16 L.Ed.2d 908 (1966) held to be a search. *See, e.g., Lovvorn*, 846 F.2d at 1542; *McDonell v. Hunter*, 809 F.2d 1302, 1307 (8th Cir.1987); *Allen v. City of Marietta*, 601 F.Supp. 482, 488 (N.D.Ga.1985). Others cite the high degree of privacy our society accords to the act of urinating. *Nat'l Treasury Employees Union v. Von Raab*, 816 F.2d 170, 175 (5th Cir.1987), *cert. granted*, —— U.S. ——, 108 S.Ct. 1072, 99 L.Ed.2d 232 (1988). Indeed, one court has gone so far as to declare that "drug testing of ... bodily wastes is even more intrusive than a search of a home." *Nat'l Treasury Employees Union v. Von Raab*, 649 F.Supp. 380, 386 (E.D.La.1986), *rev'd*, 816 F.2d 170 (5th Cir.1987).

Because particular circumstances are so important in Fourth Amendment analysis, it can be counter-productive to rely on broad principles or to look far afield for analogies to resolve individual cases. The overbreadth of plaintiff's argumentative net is nowhere more apparent than in his objections to the way the urine specimen was taken, and to the very idea of urinalysis. Thus, plaintiff argues that, "[t]he interests of human dignity and privacy.... are implicated with ... force when individuals are directed to urinate in the presence of a government agent." *Capua v. City of Plainfield*, 643 F.Supp. 1507, 1514 (D.N.J. 1986). But a government agent observing a prospective employee urinate violates no known "command of the United States Constitution." *Katz*, 389 U.S. at 350 n. 5, 88 S.Ct. at 510 n. 5. Plaintiff makes much of the fact that a female government employee watched him while he urinated. Bypassing plaintiff's own apparent failure to protest at the time, the courts have yet to articulate a constitutional right of "modesty," as Judge Guy notes in his *Lovvorn* dissent. *Lovvorn*, 846 F.2d at 1552.

As for the collection and testing of urine, although a search does not necessarily require a physical intrusion, "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz*, 389 U.S. at 351, 88 S.Ct. at 511. Based upon this language, courts have reasoned that the taking of voice and handwriting samples are not Fourth Amendment "searches." *United States v. Dionisio*, 410 U.S. 1, 14, 93 S.Ct. 764, 771, 35 L.Ed.2d 67 (1973) (voice); *United States v. Mara*, 410 U.S. 19, 21, 93 S.Ct. 774, 775, 35 L.Ed. 2d 99 (1973) (handwriting). More recently, the Supreme Court has held that citizens do

not have a reasonable expectation of privacy in garbage placed in opaque bags outside their home for collection. *California v. Greenwood,* —— U.S. ——, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988). In that case, Justice White recognized that citizens may have a subjective expectation of privacy, but found specifically that such an expectation does not give rise to Fourth Amendment protection "unless society is prepared to accept that expectation as objectively reasonable." *Greenwood,* 108 S.Ct. at 1628.

■ One might argue that, because urine is a waste product turned over to the municipal sewage system, there is no search. But again, I need not reach such a conclusion to find that testing the urine of an applicant for a position with the government does not constitute a search. Again, whether or not a drug test constitutes a Fourth Amendment search depends on the concrete facts surrounding it—specifically, the expectation of privacy that the person involved may hold both objectively and subjectively.

Further, plaintiff has argued that the taking of a urine specimen constitutes a search within the meaning of the Fourth Amendment because "urine can be analyzed in a medical laboratory to discover numerous physiological facts about the person from whom it came, including, but not limited to recent ingestion of alcohol or drugs." *Capua,* 643 F.Supp. at 1513. One court has ruled that an individual not only has an expectation of privacy in the process of urination but also in the information contained in the urine. *Von Raab,* 816 F.2d at 175–76. The court reasoned that examination of the urine sample would reveal other personal secrets that the government has no right to know. Urinalysis has the troublesome potential to disclose a broad range of information, but the Department's policy avoids realizing this potential by limiting use of such tests to disclosure of unprescribed or controlled substance abuse. *See* P.A.P. 85–05, 3.0.

Defendants argue, and I agree, that the provision of urine specimens as part of a physical examination to determine fitness for employment does not constitute a Fourth Amendment search. The federal government requires employees in, or applicants for, positions with physical or medical standards to submit to physical examinations prior to appointment or selection, 5 C.F.R. § 339.301(a)(1) (1987). Courts have upheld such physicals as constitutional for both federal and state employees. *See Bratcher v. United States,* 149 F.2d 742, 745 (4th Cir.), *cert. denied,* 325 U.S. 885, 65 S.Ct. 1580, 89 L.Ed. 2000 (1945); *McDonell v. Hunter,* 612 F.Supp. 1122, 1130 n. 6 (S.D.Iowa 1985), *modified,* 809 F.2d 1302 (1987); *Curry v. New York Transit Auth.,* 56 N.Y.2d 798, 437 N.E.2d 1158, 452 N.Y.S.2d 401 (1982). The federal government also conducts extensive field investigations into applicant's backgrounds for sensitive positions in the federal service. *See* Federal Personnel Manual, Chapter 733. Pre-employment physical examination, including urinalysis, is simply too familiar a feature of the job market on all levels to permit anyone to claim an objectively based expectation of privacy in what such analysis might disclose.

*Coppinger,* on its facts, involving post-employment blood and urine analysis as part of a disciplinary investigation, and other authority in this Circuit, does not preclude such a ruling here. *See Mack v. United States,* 814 F.2d 120, 125 n. 2 (2d Cir.1987) (noting Judge Higginbotham's concurring opinion in *Nat'l Treasury Employees Union v. Von Raab,* 808 F.2d 1057, 1060, 1062 (5th Cir.1987), which questions whether urinalysis is a search). *See also Burka,* 680 F.Supp. at 603 ("We note initially, without determining the issue, that this court has certain reservations as to whether mere production of a urine specimen, if done in conjunction with a routine medical exam or pre-employment physical, constitutes a search or seizure, since a urine sample typically is required in order to check for numerous problems such as diabetes. We recognize that there is considerable precedent to the contrary, but that precedent is outside this circuit.")

Nor does the evidence strengthen plaintiff's position with respect to his subjective

expectation. Defendants note that he was forewarned he would be tested as part of the pre-employment physical. The Department gave plaintiff a copy of P.A.P. 85–05 when he applied for a position. Citta Dep. at 78. *See also* Substance Abuse Policy and Procedure, 85–05, 8.2 Testing procedure, p. 12 ("The employee will sign a consent form indicating that he or she knew a [drug] test was being performed...."); Substance Abuse Manual for Use with PAP 85–05, p. 2 ("[A]ll candidates [for employment] ... [will] sign a *statement* acknowledging that specific substances found in their urine will disqualify them from employment and/or will lead to termination during their probationary period.") Plaintiff in his deposition does not remember seeing such a document, although he conceded, "I guess it [the test] might have been for substance abuse." Fowler Dep. at 93.

However, plaintiff's lesser expectation of privacy does not turn on consent. As I have shown, subjective expectation generated by a warning or other indicium of voluntary consent does not necessarily prevent government conduct from being considered a Fourth Amendment search.[5] If it did, "the government could diminish each person's ... expectation of privacy merely

by announcing half-hourly on television that ... we were all forthwith being placed under comprehensive electronic surveillance." Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn.L.Rev. 349, 384 (1974). Rather, dominant in the *Katz* inquiry of whether a search has taken place and critical for the holding here is the objective component: the fact that a reasonable applicant for a Sanitation Department job would understand that he would be required to take a physical examination, including urinalysis, not for any law enforcement purpose but simply to determine his fitness for employment. Accordingly, I find that the test conducted as part of plaintiff's pre-employment physical examination was not a search within the meaning of the Fourth Amendment.

### III.

Plaintiff argues that, even if the first test was constitutional, the later tests when he was a probationary employee violated the Fourth Amendment. The record supports an argument that as a probationary employee plaintiff had a diminished expectation of privacy such as to remove the later tests from the category of Fourth Amendment searches.[6]

---

**5.** Plaintiff also argues that consent would be impossible here because of the inherently coercive alternative of refusing to consent. Plaintiff in support cites department policy indicating that refusal to submit to a test may be used to infer drug use in any disciplinary action. Of course, the Supreme Court has generally held that government employers cannot require employees to consent to unreasonable searches as a condition of employment. *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). At least one court has held that consent to drug tests where the employee "legitimately fear[s] termination" is coercive. *American Fed'n of Gov't Employees v. Weinberger,* 651 F.Supp. 726, 736 (S.D.Ga.1986). Other courts, however, have found voluntary consent where individuals faced either a possible loss of economic livelihood or loss of government benefits. *See Zap v. United States,* 328 U.S. 624, 628, 66 S.Ct. 1277, 1279, 90 L.Ed.2d 1477 (1946) (court found voluntary consent although the only way to attain government business was to submit to a search), *judgment vacated on unrelated issues,* 330 U.S. 800, 67 S.Ct. 857, 91 L.Ed. 1259 (1947); *McMorris v. Alioto,* 567 F.2d 897, 901 (9th Cir.1978) (courthouse

search); *United States v. Doran,* 482 F.2d 929, 932 (9th Cir.1973) (airport search); *Wyman v. James,* 400 U.S. 309, 317, 91 S.Ct. 381, 385, 27 L.Ed.2d 408 (1971) (voluntary consent where the government makes public aid contingent on visits to the recipients' homes).

**6.** This distinction between probationary and permanent employees is highlighted in the civil service sector because of the property rights which attach when an employee attains permanent status. Describing the status of an employee during the one year period of probation, the Department's director of health and safety Anthony J. Citta stated in his deposition that "a probationary period, in a sense, is almost an extension of pre-employment. Medically you would be closely monitoring the employee's health care status.... During that period you are monitoring the employees very closely, in terms of their health care status, and if they develop a medical condition, or a substance abuse problem, or what have you, they can be terminated without a hearing, without a professional hearing." Citta dep. at 43–44. This distinction is reflected in P.A.P. 85–05: as a general rule, the policy regarding substance abuse for

But I need not and do not reach the issue of whether there is any meaningful distinction between the privacy expectations of an applicant and those of a probationary employee, because I find that the last three tests were founded on sufficient individualized suspicion to be reasonable under even an exacting test. *See, e.g., Capua,* 643 F.Supp. at 484. Use of only one EMIT test has been determined to have an accuracy rate of better than 95 percent. *Lovvorn,* 647 F.Supp. at 877; *See also Spence v. Farrier,* 807 F.2d 753, 756 (8th Cir.1986) (EMIT test, with a confirmatory second EMIT or other test, contains sufficient indicia of reliability to provide evidence of drug use); *Harmon v. Auger,* 768 F.2d 270, 276 (8th Cir.1985) (EMIT test results are "about 95% accurate" and form a sufficient basis for disciplinary action); *Wykoff v. Resig,* 613 F.Supp. 1504, 1512 (N.D.Ind. 1985) (a positive EMIT test confirmed by a second EMIT test or its equivalent satisfies due process); *Jensen v. Lick,* 589 F.Supp. 35 (D.N.D.1984) (unconfirmed EMIT test results satisfy due process). The EMIT tests have also been held by Judge Sand of this court to have an accuracy of at least 98% when combined with a subsequent EMIT confirming test. *Peranzo v. Coughlin,* 675 F.Supp. 102, 105 (S.D.N.Y.1987), *aff'd,* 850 F.2d 125, 126 (2d Cir.1988). This high level of accuracy was sufficient for Judge Sand to conclude that the use of the results as evidence, even as the only evidence, in a prisoner disciplinary hearing does not offend due process. *Peranzo,* 675 F.Supp. at 105. Prisoner disciplinary action must be based on "some evidence" to be constitutional. *Superintendent, Mass. Correctional Inst. v. Hill,* 472 U.S. 445, 454, 105 S.Ct. 2768, 2773, 86 L.Ed.2d 356 (1985) (loss of good time credits). "Some evidence" is certainly greater than "reasonable suspicion," which has been defined as that quantum of evidence sufficient to support a *belief* that the individual used drugs. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Moreover, 98% accuracy far surpasses the level of proof required for reasonable suspicion; indeed, following

Judge Weinstein's assignment of percentages to various standards of proof, a 98% accuracy rating amply meets the percentage (95%) required for proof beyond a reasonable doubt. *United States v. Fatico,* 458 F.Supp. 388, 403–6 (E.D.N.Y.1978), *aff'd,* 603 F.2d 1053 (2d Cir.1979), *cert. denied,* 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980). Defendants' testing procedure is also more extensive than the prison tests because it requires two different kinds of tests (an initial EMIT test and a subsequent hydrolysis test) for two samples. Here, plaintiff's sample A in the first procedure was positive for both EMIT and hydrolysis, thus providing sufficient evidence to constitute reasonable suspicion. That the second sample's results were split has no bearing because the second sample itself was an extra procedure beyond the requirements necessary to establish reasonable suspicion.

*Coppinger,* 861 F.2d at 35, may be read as endorsing a "reasonable suspicion" standard for post-employment drug testing, thus supporting the holding here that plaintiff's later tests were constitutional because they were based on reasonable suspicion. However, because the Supreme Court has counselled that an employee's reasonable expectation of privacy should be addressed on a "case-by-case" basis, *O'Connor,* 480 U.S. at 718, 107 S.Ct. at 1498, I must balance plaintiff's privacy interest against the government's interests in the later searches before I can find that the urinalysis during the probationary period, which I have assumed *arguendo* to be searches, were reasonable under the Fourth Amendment.

Determining the standard of reasonableness applicable requires "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of governmental interests alleged to justify the intrusion." *United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983). Accordingly I must balance the plaintiff's "reasonable expectation of privacy," that

permanent employees is more treatment-oriented than for probationary employees, although treatment is nevertheless encouraged for them as well.

expectation which society is "prepared to recognize as legitimate," *New Jersey v. T.L.O.*, 469 U.S. 325, 338, 105 S.Ct. 733, 741, 83 L.Ed.2d 720 (1985) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)), against "[t]he governmental interest [in] the efficient and proper operation of the workplace." *O'Connor*, 480 U.S. at 723, 107 S.Ct. at 1501.

■ "Reasonableness" does not turn solely on whether the government could have used less intrusive means to search. *Wilkinson v. Forst*, 832 F.2d 1330, 1340 n. 13 (2d Cir.1987), *cert. denied sub nom. Kelly v. Wilkinson*, — U.S. —, 108 S.Ct. 1593, 99 L.Ed.2d 907 (1988). Rather, a court must direct its attention to the actual means employed by the government. Urinalysis is difficult to classify because, while the actual physical intrusion is slight, the "embarrassment" factor has been perceived by some to be high. Urinalysis is certainly less intrusive than a blood test. It does not involve a physical intrusion into the skin, but merely the collection of a naturally and frequently voided waste product. As one court has written, "[t]he collection of a urine sample has little in common with stomach pumping or body cavities' searches (or even with the taking of a blood sample, which requires the infliction of an injury, albeit a small one). It is even less intrusive than a fingerprint, which requires that one's fingers be smeared with grease and pressed against paper." *Mack*, 653 F.Supp. at 75.

■ Intrusiveness is also measured by the manner in which the test is conducted. In *Schmerber*, 384 U.S. at 771, 86 S.Ct. at 1836, the Supreme Court set out guidelines for determining whether the testing procedure itself is reasonable. First, the test must be reasonably accurate. As I have demonstrated, the Department's testing procedures provide for a high degree of accuracy. Second, the procedure must be routine or "commonplace" such that it involves "virtually no risk, trauma or pain." *Schmerber*, 384 U.S. at 771, 86 S.Ct. at 1836. Most individuals have frequently provided their doctors with urine specimens. Giving a urine sample is thus a routine occurrence which involves no risk of trauma or pain, especially when given in private. Finally, according to *Schmerber*, medical personnel should perform the test "according to accepted medical practices." 384 U.S. at 771, 86 S.Ct. at 1836. In this case, the test was conducted at a private laboratory by trained professionals.

Although observation of the act of urination could arguably come within the Supreme Court's definition of "trauma," any damage would be slight, involving nothing more than momentary bashfulness. *See also American Fed'n of Gov't Employees*, 651 F.Supp. at 734 (lack of observation does not appreciably decrease the intrusiveness of the search). In short, I conclude that the intrusiveness of the search was slight.

On the other side of the scale, the Department has several weighty interests at stake in continuing to test an employee about whom it has an individualized suspicion of drug use, as was the case here.

Foremost is public safety. Plaintiff concedes that, as a sanitation worker, he would be required to drive sanitation trucks in busy city streets and to operate heavy machinery. According to the uncontested affidavit of Christopher Beemer, Deputy Commissioner for Administration and Financial Management in the Department, approximately 75% of sanitation workers drive a vehicle every day; 95% of them drive a vehicle in the course of a year. The collection vehicles weigh up to 13 tons and range in length from 30½ to 33 feet. Beemer describes other safety hazards:

> The mechanical sweeper used for street cleaning operations requires some skill in balancing, therefore sanitation workers driving such equipment have to be in an alert, fit state. Other ... heavy mechanical equipment—which is driven in snow removal operations in which virtually all ... sanitation workers participate—include the salt spreader, having a length of 28½ feet, and the snow plow. Snow removal operations are obviously conducted during inclement weather and under difficult street conditions.... Apart

from the need to drive safely and to load the truck on heavily travelled streets, the collection mechanism on the truck can cause physical injury if not safely operated.

Beemer Aff. at 3. The prospect of a drug-impaired employee at the wheel of such vehicles on New York streets is "fraught with imminent and grave consequences to public safety." *Patchogue–Medford Congress of Teachers v. Bd. of Educ.,* 119 A.D.2d 35, 505 N.Y.S.2d 888, 891 (2d Dep't 1986), *aff'd,* 70 N.Y.2d 57, 510 N.E.2d 325, 517 N.Y.S.2d 456 (1987).

The Department has documented a significant problem of drug use by employees which markedly affects their performance. In 1987, 359 vehicle accidents warranted breathalyzer and/or urinalysis testing of the drivers. Of those drivers, 18% tested positive for drug or alcohol use. Beemer Aff. at 4. More than 30% of the drivers referred to a corrective defensive driving program in 1986 tested positive for drug or alcohol use. Finally, of 173 workers in 1987 whose poor performance warranted substance abuse testing, 37% tested positive for drug or alcohol use. Plaintiff argues that these statistics are irrelevant because they fail to differentiate between drug and alcohol use. Even if only a third of the positive tests were for drug abuse, however, these numbers still show a substantial correlation between poor job performance and drug use.

Numerous cases have cited public safety concerns in upholding mandatory drug testing of workers involved in hazardous activities or those who perform functions which involve the safety and welfare of large numbers of people. *See, e.g., Transport Workers Union of Philadelphia, Local 234 v. Southeastern Pennsylvania Transp. Auth.,* 863 F.2d 1110, 1124 (3d Cir.1988) (railroad workers); *Rushton v. Nebraska Pub. Power Dist.,* 844 F.2d 562 (8th Cir.1988); *Jones v. McKenzie,* 833 F.2d 335 (D.C.Cir.1987) (school bus attendant and other transportation department employees); *Division 241, Amalgamated Transit Union v. Suscy,* 538 F.2d 1264 (7th Cir.) (*per curiam*), *cert. denied,* 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632 (1976) (bus drivers and other transportation workers); *Allen v. City of Marietta,* 601 F.Supp. 482 (N.D.Ga.1985) (electrical workers); *but see Railway Executives Ass'n v. Burnley,* 839 F.2d 575 (9th Cir.), *cert. granted,* — U.S. —, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988) (invalidating post-accident drug testing of railroad employees).

Plaintiff distinguishes these cases by arguing that "all of the decisions dealt with organizations affirmatively responsible for the safety and security of the public." Pltf.'s Memorandum of Law at 13. To read the cases that narrowly is to miss their point. It is not responsibility for public safety, perceptible *a priori* in every aspect of a job, that rationalizes the outcome of those cases, but rather the possible consequences of drug-induced error. Those consequences provide the measure of the government's interest. If those consequences could produce significant harm— as they could if the driver at the controls of a 30–foot, 13–ton Sanitation Department truck navigates in a drug-induced haze— then the interests of the government activated by reasonable suspicion may override the interests of the individual in avoiding a urine test.

Moreover, courts have held that "the government has the same right as any private employer to oversee its employees and investigate potential misconduct relevant to the employee's performance of his duties." *Allen,* 601 F.Supp. at 491. And, as the Supreme Court said in *O'Connor,* "[p]ublic employers have an interest in ensuring that their agencies operate in an effective and efficient manner, and the work of these agencies inevitably suffers from the inefficiency, incompetence, mismanagement or other work-related misfeasance of its employees." 480 U.S. at 724, 107 S.Ct. at 1502.

Studies demonstrate that drug abusers operate at only 50 to 67 percent of their capability. *See* Rothstein, *Drug Testing in the Workplace: The Challenge to Employment Relations and Employment Law,* 63 Chi–Kent L.Rev. 683, 688 (1987). Employees who abuse drugs have an absenteeism

rate 16 times higher than employees who do not use drugs. *See* Imwinkelreid, *Some Preliminary Thoughts on the Wisdom of Governmental Prohibition or Regulation of Employee Urinalysis Testing*, 11 Nova L.Rev. 563, 565 (1987). While an employee's drug use is occasionally discoverable through evidence of absences, tardiness or errors, supervisors in most situations are unable to detect the nuances in employee behavior indicative of drug abuse. *See Mulholland v. Dep't of Army*, 660 F.Supp. 1565, 1569 (E.D.Va.1987) (direct observation provides little basis to assess an individual's possible use of drugs; tests are more conclusive). In an affidavit submitted in connection with another pending drug testing case and supplied to this court by defendants, Dr. Robert DuPont explains that drug use is far harder for lay people to detect than, say, alcohol use. *See* DuPont Aff. at ¶¶ 14–27 ("As a psychiatrist who has worked with drug users for 20 years, I would not treat a drug abuser without conducting regular urine tests simply because, even sitting in a room talking with a known drug abuser for 50 minutes in psychotherapy, I cannot reliably tell whether the person is or is not under the influence of drugs.") This detection problem becomes more acute because drugs affect individuals long after ingestion. Serious skill impairment has been measured 24 hours after smoking a single marijuana cigarette. Yesavage, Leirer, Denari, and Hollister, *Carry–Over Effects of Marijuana Intoxication on Aircraft Pilot Performance: A Preliminary Report*, 142 American Journal of Psychiatry 1325–29 (November 1985). This evidence refutes the argument that the government should not be able to examine employee behavior outside work hours. Obviously, the government has a very real interest in preventing drug abuse outside work hours because of the direct and deleterious impact on performance during work hours.

Moreover, at a minimum, a small decrease in productivity among even a small percentage of public employees can lead to a massive waste of taxpayer's money. Here, the Department has shown that nearly 10% of samples from applicants test positive for drugs. Beemer Aff. at 5–6. Moreover, 46.55% of all probationary terminations result from positive substance abuse tests. Beemer Aff. at 6. This figure includes both alcohol and drug tests. Nevertheless, even assuming that only a third were for positive drug tests, drug use still constitutes a substantial percentage (16%) of terminations. A 25% reduction in the performance of 10% of its employees could cost the government a substantial amount. The National Institute on Drug Abuse estimates the current cost of drug use by workers at $100 billion per year. National Institute on Drug Abuse: *Drugs in the Workplace*, NIDA Capsules, March 1986. It does not require much extrapolation to appreciate the financial burden placed on public employers. Further, a court may find the government liable for acts committed by a government employee while under the influence of drugs. *Ira S. Bushey & Sons, Inc. v. United States*, 398 F.2d 167 (2d Cir.1968). Given the liability crisis facing municipalities across the country, the Department has a strong financial interest in taking affirmative measures designed to reduce the risk of accidents and related injuries.

Plaintiff taxes the Department with failure to apply its own procedures correctly, and seeks thereby to enhance his own alleged subjective expectation of privacy and to attack the Department's conduct. Thus, plaintiff contends that the Department had violated its notification policy by not telling plaintiff of his split test until April 28, 1986 and then falsely stating it was positive. Plaintiff states that he was never told the June test could lead to termination. Finally, plaintiff claims a greater expectation of privacy for the third test because the Department violated its own policy for split result situations.

Plaintiff, however, signed a statement on April 28 indicating he fully understood that future testing (at least two) would be required and that a positive test during the probationary period would result in termination. Even assuming that the Department's policy was violated, any impression plaintiff gleaned from perusing the Depart-

ment's procedural manuals that only one test would be administered was more than offset by a statement he *signed* which specifically warned him of future tests and the possibility of termination.

In short, *plaintiff knew full well that he would be tested in the future.* Any deviation from established procedures—if there was any—cannot change that fact. To the extent that plaintiff is arguing that the Department acted unconstitutionally by violating its own policy guidelines in testing him after receiving a negative result on the second test, he is incorrect. Even I were persuaded that the Department violated its own policy, plaintiff has still not shown how this could rise to the level of a Fourth Amendment violation. Those guidelines define the Department's internal procedures, not plaintiff's constitutional rights. *Cf. Crocker v. Hakes,* 616 F.2d 237, 239 n. 2 (5th Cir.1980) ("The violation of a state statute does not automatically give rise to a violation of rights secured by the Constitution.")

Most importantly, none of plaintiff's arguments convincingly elevates his own interest in avoiding urinalysis above the public's interest, described above, in preventing the wasteful and potentially disastrous consequences of permitting a Sanitation Department probationary employee as to whom there is reasonable and individualized suspicion of drug use to continue to work.

To recapitulate, I find the first test, conducted in connection with the pre-employment physical examination, was not a search within the meaning of the Fourth Amendment, and that subsequent tests at a minimum were based on reasonable suspicion and accordingly were reasonable under the Fourth Amendment.

## IV.

■ Plaintiff's remaining arguments do not warrant extended consideration. He claims a violation of the due process clause of the Fourteenth Amendment because he was terminated without notice of the charges against him and an opportunity to be heard. Although the letter of termi-

nation dated July 28, 1986 did not state any reasons, an August 15, 1986 letter from Christopher Beemer, Deputy Commissioner for Administration, clearly notified plaintiff he was fired for violating the Department's rules against use of controlled substances. Two weeks is not an unreasonable delay in giving notice. Moreover, in order to make out a due process claim, plaintiff must demonstrate a property interest in his position derived from reliance induced on the state's express agreement or implied promise. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). As a probationary employee, plaintiff certainly has no such right under New York law.

■ Plaintiff's alternative argument, that he was deprived of a liberty interest without due process because the charges of drug abuse tarnished his reputation, is also without merit. The substance abuse manual for PAP 85–05 provides that, "all records for employee's involved under the regulations of PAP 85–05 shall be treated as confidential. No information regarding an employee's substance abuse problem may be released to an outside agency without the employee's express authorization." Substance Abuse Manual at 1. Plaintiff has failed to demonstrate a necessary element that defendants published or disseminated false defamatory information to the public, *Loudermill,* 470 U.S. at 547 n. 13, 105 S.Ct. at 1496; *see also Clements v. County of Nassau,* 835 F.2d 1000, 1006 (2d Cir.1987), or that there is a threat he will be deprived of other employment opportunities as a result of defendant's public disclosure of his substance abuse. *Walentas v. Lipper,* 862 F.2d 414, 420–421 (2d Cir. 1988). Accordingly, summary judgment is granted on this claim as well.

■ Plaintiff's complaint also asserts a claim for violation of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Plaintiff, however, has failed to provide any argument to buttress this claim. Moreover, in a case involving termination of transit workers whose drug tests were positive, Judge Goettel, in a thorough opinion, found no violation of the Act and dismissed

such a claim. *Burka,* 680 F.Supp. at 596–601. I similarly conclude that plaintiff's claim based on that statute is without merit.

 Finally, because all of the federal claims are without merit, I find the state law claims should be dismissed for lack of pendent jurisdiction. *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

In sum, defendants' motion is granted; plaintiff's motion is denied. The complaint is dismissed.

SO ORDERED.